ORDERED in the Southern District of Florida on _November 17, 2006_



_John C. Olson_
John K. Olson, Judge
United States Bankruptcy Court


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

| | | |
|---|---|---|
| IN RE:<br>JEFFREY C. HAMM and<br>HONIE SUE HAMM,<br><br>    Debtors.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>) | Bk. No. 05-24225-BKC-JKO<br><br>Chapter 7 |
| JEFFREY C. HAMM and HONIE<br>SUE HAMM,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adversary No. 05-2370-BKC-JKO-A |

**FINDINGS OF FACT, CONCLUSIONS OF LAW**
**AND MEMORANDUM OPINION**

1

This case presents the appalling tale of a Harvard educated and trained plastic surgeon and his wife who – despite an income that puts them squarely in the top 1% of personal incomes in the United States – have chosen to live in a self-indulgent dream world where every day is a good day for fine dining and, following the lead of Leona Helmsley, "only the little people pay taxes."[1]

Here on their second foray into chapter 7 in this bankruptcy court in only six years, the Debtors Jeffrey C. Hamm, M.D., and Honie Sue Hamm brought this adversary proceeding seeking a determination that their federal income tax liabilities for the 1995, 1996, 1997, 1999 and 2001 tax years were discharged in their underlying chapter 7 case. The United States acknowledges that the tax liabilities are discharged unless they are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C), as taxes "with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax." The Debtors deny that they willfully attempted to evade or defeat such tax liabilities and contend that their tax liabilities were discharged. Because I find that the Debtors undertook a consistent pattern of affirmative acts to evade the collection of the income taxes which they owed for each of these years, I conclude that the Debtors' tax liabilities survive the general chapter 7 discharge under 11 U.S.C. § 727(b), survive their latest bankruptcy, and may be enforced by the Government.

## Findings of fact

### I. The Debtors

1.    Jeffrey C. Hamm, a Harvard-trained plastic surgeon, is a capable, perhaps even brilliant individual. Before completing Harvard Medical School in 1980, he had received his bachelor's degree *magna cum laude* in chemistry from Harvard College in 1968, where he enjoyed

---

[1] *See* 4/11/05 *Forbes* 94, V. 175, Issue 7, 2005 WLNR 4948881

1

the rare experience of working with a Nobel Prize winner in chemistry. Dr. Hamm later had fellowships at the London Hospital Medical College and at Oxford University. (Hearing Transcript "Trans." at 66:12-67:7).

2.     At most times since his graduation from Harvard Medical School, Dr. Hamm has owned his own plastic surgery practice. He formed Jeffrey C. Hamm, M.D., F.A.C.S., P.A. (the "S-corporation") after completing his surgical residency in 1985. (Trans. at 67:16).

3.     After dissolving the S-corporation in its own chapter 7 bankruptcy, Dr. Hamm continued practicing as a Limited Liability Company. (Trans. at 67:18). He continues to practice as a plastic surgeon to this day. (Trans. at 24).

4.     Dr. Hamm met his wife, Honie Sue Hamm, while attending Harvard. Mrs. Hamm worked on campus as an administrative assistant and took a number of college-level courses at the University. (Trans. at 107:19-21). Prior to taking the position at Harvard, Mrs. Hamm had also completed two years of college and had taken an additional college-level course at Boston University. (Trans. at 106-107).

5.     Mrs. Hamm left her position at Harvard in 1971 and has not been employed since. (Trans. at 108).

6.     Dr. Hamm has consistently enjoyed significant financial success as a plastic surgeon. Dr. and Mrs. Hamm reported nearly $4,000,000 in adjusted gross income between 1993 and 2004. (Def.'s Ex. A). Specifically, Dr. and Mrs. Hamm reported the following amounts (Trans. 26:15-27:8; Def.'s Exs. A, AD, AE, AF, AG, AH, AI, AJ, AK, AL, AM, AN, and AO):

| | |
|---|---|
| 1993 | $ 465,318 |
| 1994 | 332,345 |
| 1995 | 334,734 |
| 1996 | 361,050 |
| 1997 | 346,745 |
| 1998 | 279,898 |
| 1999 | 336,728 |
| 2000 | 398,321 |
| 2001 | 490,243 |
| 2002 | 170,368 |
| 2003 | 289,854 |
| 2004 | <u>172,966</u> |
| **Total** | **$3,978,570** |

7.      All of this income flowed through Dr. Hamm's surgical practices to the Debtors' individual income tax returns where it was then subjected to income taxation. (Trans. 20:8-12).

8.      Despite earning nearly $4,000,000 during this twelve-year period, the Debtors failed to pay their federal income tax liabilities for the relevant years.

9.      Both Debtors have been aware of their unpaid debts to the Internal Revenue Service since at least 1995. (Trans. at 100:9-12; 119:6-8).

## II. The decision to file the 1999 chapter 7

10.      On December 14, 1998, the Internal Revenue Service mailed the Debtors a final notice of intent to levy on their bank account. (Def. Ex. P). The notice made clear that the Internal Revenue Service was preparing to levy on the Debtors' bank account in order to partially satisfy their unpaid income tax liability for 1997. (Id.)

11.      Dr. Hamm understood that the notice meant that the IRS intended to take money involuntarily from his account. (Trans. at 68:5-7). On December 17, 1998, he had the notice sent

to his accountant, Keith Bennett, for advice on how to respond to the Government's collection efforts. (Def.'s Ex. P; Trans. at 68:8-12).

12.     Keith Bennett recommended that Dr. and Mrs. Hamm file for bankruptcy as a way to delay collection. (Trans. 68:16-19).

13.     Dr. and Mrs. Hamm indicated that they were "horrified" over this advice, and rather than impulsively filing a bankruptcy petition, that they both "agonized" over the decision. (Trans. 68:20-69:1; 108:18-21).

14.     During this period of contemplation, Dr. Hamm purchased a book on the bankruptcy process so that he could make an informed decision. Dr. Hamm read the entire book. (Trans. 69:7-8). Through this book, Dr. Hamm came to understand the concept of a chapter 7 liquidation; specifically, he understood that if he and his wife filed a chapter 7, their assets would be liquidated in satisfaction of their debts. (69:2-17).

15.     At some point after December 17, 1998, Dr. and Mrs. Hamm decided to go forward with the bankruptcy. On May 24, 1999, they filed a joint chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida, Case No. 99-23504-RBR. (Def.'s Ex. M). The 1999 chapter 7 is separate and distinct from the one filed by the Debtors in 2005 in which this adversary proceeding arises.

16.     The Internal Revenue Service filed a proof of claim in the 1999 Chapter 7 for a total of $285,278.67. (Def.'s Ex. AC).

4

### III. **Tax avoidance**

### A. **Avoidance in preparation for 1999 chapter 7[2]**

17.     Prior to filing the May 24, 1999 petition, Dr. and Mrs. Hamm took several steps in order to prevent a meaningful distribution to the Internal Revenue Service. The evidence introduced at trial (and discussed below) makes clear that Dr. and Mrs. Hamm had engaged in a well-orchestrated campaign of "pre-bankruptcy planning" that included ridding themselves of assets otherwise available for distribution to their creditors, including the Internal Revenue Service, and making payments on debts preferred over their taxes.

18.     The result of these efforts is shown by the review of a financial "snapshot" taken of the Debtors on their petition date. As described above, the Debtors earned, on average, more than $300,000 a year. Nevertheless, their schedules listed only $2,669 worth of personal assets (Def.'s Ex. L). A review of those schedules reveals that $1,000 of that amount was attributable to a 1987 Corvette. Therefore, other than this one car, the Debtors represented to the Court that they owned only $1,669 in personal assets despite their consistent, substantial income. Included in this list of personal assets was a checking account with NationsBank bearing an account number ending in "8035" with a zero balance as of the date of the petition.

19.     Similarly, as of the 1999 petition date, the Debtors' real estate holdings consisted solely of their primary residence. (Trans. 71:8-20).

---

[2]The Debtors' actions in connection with their 1999 bankruptcy filing are relevant here because they are seeking a determination that taxes for years 1995, 1996, and 1997 – all of which survived their 1999 bankruptcy – are dischargeable here in their 2005 bankruptcy.

5

20.    This financial "snapshot" differs significantly from a similar "snapshot" taken just three months earlier when the Debtors owned additional real estate and had tens of thousands of dollars available in their checking account.

21.    However, after learning that the Internal Revenue Service intended to levy on their assets (but before actually filing the chapter 7 petition), the Debtors began shuffling these assets in order to prevent their distribution to the Internal Revenue Service.

### a. Dissipation of checking account

22.    As described above, the Debtors' bankruptcy schedules listed their checking account ending in "8035" as having a zero balance on the date of filing. Interestingly, however, the Debtors' bank statement for this same account dated only 76 days earlier shows an opening balance of $57,301.55. (Def.'s Ex. K).

23.    In addition to the opening balance, the statement also lists an additional $33,161.04 in total deposits during this period. (Id.) Finally, the closing balance for the account totaled a relatively meager $1,954.79. (Id.) In other words, Dr. and Mrs. Hamm withdrew nearly $90,000 from this account over the course of one month. (Trans. at 79:16-23).

24.    Neither Dr. nor Mrs. Hamm could definitively explain during their testimony what happened to this money. (Trans. 78:18-23). After expressing an ostensible unfamiliarity with the concept of bank statements and debit cards as a whole (Trans. at 116:12-17; 117:1-4; 125:3-7), Mrs. Hamm proceeded to speculate that the money was used to pay bills. (Trans. at 118:24-119:5).

25.    If that were true, one would expect such payments to be listed on the Debtors' Statement of Financial Affairs filed contemporaneously with the May 24, 1999 petition. At item number 3 of the Statement of Financial Affairs, the Debtors were required to list all payments to

6

creditors made within 90 days of the bankruptcy.[3] The Debtors did not list a single payment. (Def.'s Ex. Q).

26.    By dissipating nearly $90,000 from their bank account shortly before filing for bankruptcy, the Debtors prevented this money from becoming part of their bankruptcy estate.  As a consequence of these actions, these monies were unavailable for distribution to the Internal Revenue Service or any other creditors in the bankruptcy.

### b. Sale of the town house

Dr. Hamm's financial success as a plastic surgeon allowed him the means to purchase a second home in order to provide his parents with a place to live. (Trans. at 72:5-6).

27.    Although his parents actually lived in the town house, the property belonged to Dr. and Mrs. Hamm at all times. (Trans. at 72:7-12).

28.    However, the Debtors never collected a single rent payment from Dr. Hamm's parents for their use of the property.[4]  (Trans. at 72:13-15).  In addition to living rent-free, Dr. Hamm's parents were not responsible for any other expenses associated with the property, such as insurance. (Trans. at 64:1-5).  The Debtors subsidized this rent-free arrangement for approximately twelve years. (Trans. at 71:22-24; 72:23-73:1).

---

[3]If this money had been used to pay bills, those payments would have necessarily been made within 90 days of the bankruptcy because the opening date of the statement at Government's Exhibit K is only 76 days from the petition date.  Thus, any subsequent payments to creditors would have to have taken place within 90 days of the bankruptcy petition.

[4]Dr. Hamm's relationship with his parents is a curious side note to this tale.  Although both of his parents worked full-time for Dr. Hamm's surgical practice until his father's death, and his mother continues to do so, he has never compensated them for their work.  (It is conceivable that the "free use of town house" was a *quid pro quo* for this work, but these circumstances are ultimately irrelevant to the issues presented in this case.)  It is particularly curious that Dr. Hamm's mother, Charlotte Hamm, has worked for him full time for many years without compensation, while the Debtor Honie Sue Hamm has not held a job since 1971.

29.     Dr. and Mrs. Hamm had originally purchased this town house in 1987 for a total of $126,900. Then, about twelve years later, they abruptly sold the town house on March 2, 1999 (only 83 days prior to the May 24th petition) for $126,000. (Def.'s Ex. N; Trans. at 72:16-19).

30.     Dr. and Mrs. Hamm received a payoff figure for the mortgage on the town house about one week prior to the sale. According to the payoff letter, Dr. and Mrs. Hamm still owed $59,446.88 as of February 23, 1999. (Def.'s Ex. O; Trans. 73: 17-19).

31.     Having sold the town house for $126,000, Dr. and Mrs. Hamm liquidated more than $66,000 in equity. (Trans. at 74:2-3).

32.     Dr. Hamm testified at trial that he and his wife used the sale proceeds to pay off a pending foreclosure on their primary residence (Trans. at 74:4-10), thereby converting a non-exempt asset into an exempt asset (and giving rise to an interesting legal issue not relevant to this litigation).

33.     However, the Debtors disclosed no such payment on their Statement of Financial Affairs, despite the fact that any such payment would have necessarily taken place within the 90-day period leading to the petition (the sale of the town house took place 83 days prior to the May 24th petition date). (Def.'s Ex. Q).

34.     By selling the town house less than 90 days from the May 24th petition and dissipating those assets in one fashion or another, the Debtors prevented the Internal Revenue Service from receiving any distribution by way of real estate that would have otherwise been made part of their bankruptcy estate.

### c. Automobile deductions 1994-1999

35.     The Government called Dr. and Mrs. Hamm's accountant, Keith Bennett, to testify at trial.

36.     Mr. Bennett has been preparing the Debtors' tax returns and providing them with tax advice since 1989.  (Trans. at 17:11-18).

37.     Mr. Bennett has also helped the Debtors keep track of their personal and business expenses throughout the years by creating annual financial summaries.  (Trans. 17:25-18:2).

38.     In order to prepare these summaries, Mr. Bennett provides the Debtors with what he refers to as a "chart of accounts."  (Trans. 18:19-20).

39.     The chart of accounts is a blank form that has different classifications of assets, liabilities, income and expenses.  (Trans. 18:17-22).

40.     Dr. and Mrs. Hamm (with the help of Dr. Hamm's mother, Charlotte[5]) then fill out the chart of accounts throughout the course of the year.  (Trans. at 58:1-7).

41.     In order to ensure that the his clients logged their various expenses correctly, Mr. Bennett would instruct his clients on the relevant tax laws.  (Trans. at 26:5-9).

42.     Therefore, it was Dr. and Mrs. Hamm's responsibility to log accurately the various expenses and categorize them on the chart of accounts consistent with Mr. Bennett's instructions regarding the tax laws.  (Trans. at 18).

43.     Mr. Bennett would then use the chart of accounts to prepare Dr. and Mrs. Hamm's personal and corporate tax returns.  (Trans. at 19:1-4).  Mr. Bennett never investigated or requested supporting documentation for the various items recorded on the chart of accounts because, as he explained at trial, he was not hired by Dr. and Mrs. Hamm to audit their tax return information.  (Trans. at 25:23-25; 26:12-14).

---

[5]Charlotte Hamm, who also testified at trial, impressed me as a particularly meticulous bookkeeper and a very trustworthy witness.

44.    During the course of 1994 through 1999, the Debtors took numerous automobile-related deductions from their income.  (Trans. at 20:17-20).  From 1994 through 1998, the deductions were reported through Dr. Hamm's S-corporation, thereby reducing the amount of income flowing through to Dr. and Mrs. Hamm's personal tax returns.  (Trans. 20:8-23).  In 1999, these automobile expenses were deducted personally.  (Trans. at 34:6-15).

45.    The relevant deductions consisted of automobile depreciation as well as automobile-related expenses, such as gasoline, insurance and maintenance.  (Trans. at 23:2-24:11; Def.'s Exs. AQ, AR, AS, AT, J, AJ).

46.    For the years in which these deductions were taken at the corporate level, there were certain qualifying criteria in the tax laws before one could take the deductions.  Mr. Bennett testified that the corporation must actually own the car.  (Trans. at 21:11-15).  Mr. Bennett additionally testified that only use and expenses attributable to "business use" of the automobile are deductible. (Trans. at 20:21-22:5).[6]  Driving from home to the office and back does not qualify as deductible business use.  (Trans. at 21:6-10).

47.    Although Dr. Hamm's S-corporation was taking these automobile deductions, it never qualified to do so because it never owned a car.  (Trans. 97:4-6).

48.    Furthermore, I find that the cars were not being used for a business purpose.  For example, in 1994, the corporation depreciated two separate cars.  (Def.'s Ex. AQ at HAMM2725; Trans. at 22-23).  The S-corporation's Form 1120S for 1994 claims that one of the two cars was used for a business purpose eighty percent of the time, and the other was similarly used one hundred

---

[6]Mr. Bennett's explanation of the qualifying criteria was correct.  See 26 U.S.C. Section 162(a)(3) (requiring that title to the vehicle be in the corporation's name and that the car be used "for purposes of the trade or business").

percent of the time. (Id.) Given that Dr. Hamm was the sole physician in his medical practice, and that Mrs. Hamm hadn't held a job since 1971, it is not credible that two separate cars were both used for a business purpose almost full time.

49.    Although the deduction in 1999 was not taken at the corporate level (and therefore, for that year, there would be no issue of whether the S-corporation owned the car), the Debtors nevertheless failed to meet the business use requirement. (Def.'s Ex. AJ).

50.    In total, Dr. and Mrs. Hamm wrongfully deducted a total of $98,306 from their income over the course of 1994 through 1999. (Def.'s Ex. C; Trans. at 25:19-22). As a consequence, that amount of income was never subjected to federal income taxation although it was, in fact, taxable income.

## B. Avoidance activities post-1999 chapter 7

### a. The Ford trucks

51.    Following the conclusion of their 1999 bankruptcy, the Debtors orchestrated a scheme whereby title to their vehicles was placed in the names of Dr. Hamm's parents. They proceeded in this fashion with their children's vehicles as well. Thus, the Internal Revenue Service could not readily seize the vehicles in satisfaction of the Debtors' tax liabilities.

52.    The Debtors accomplished this by having Dr. Hamm's parents visit a Ford dealership and purchase four trucks: one for each of the Debtors, one for their daughter, and one for their son. Dr. Hamm's parents, Carl and Charlotte Hamm, signed all of the paperwork and took formal title to each of the four vehicles. Possession of the vehicles, however, went to the Debtors and their children. Carl and Charlotte Hamm made the monthly installment payments on each of the vehicles, which were then promptly reimbursed by the Debtors. (Trans. at 80-81).

11

53.     Charlotte and Carl Hamm purchased Dr. Hamm's vehicle in this fashion on January 29, 2000. (Def.'s Ex. F).

54.     Charlotte and Carl Hamm purchased Mrs. Hamm's vehicle in this fashion on January 9, 2001. (Def.'s Ex. E).

55.     Charlotte and Carl Hamm purchased daughter Winifred's vehicle in this fashion on May 22, 2001. (Def.'s Ex. H).

56.     Charlotte and Carl Hamm purchased son Aidan's vehicle in this fashion on October 4, 2001. (Def.'s Ex. G).

57.     Dr. and Mrs. Hamm both acknowledge that this scheme was conceived in order to shield their vehicles from the reach of their creditors. (Trans. at 87:4- 10; 115:4-10). Dr. Hamm's admission during trial is particularly damaging given his prior direct testimony by affidavit in which he falsely represented that his parents were the "true owners" and that "[t]here was no attempt to conceal the true owners, Carl and Charlotte." (Plf.'s Ex. 23, Supplemental Direct Testimony at ¶9(d)).

58.     Dr. Hamm's mother, Charlotte, similarly admitted at trial that the arrangement was conceived in order to shield the vehicles from the reach of the Debtors' creditors. (Trans. at 61:16-20).

59.     After maintaining this arrangement for some time, the Debtors fully paid off all four auto loans. On February 1, 2002, they caused four separate checks from their personal account to be issued to Ford Motor Company: one for $15,862.87, one for $14,851.02, one for $9,589.78 and one for $17,681.40. (Def.'s Ex. I; Trans. 61:21-63:3).

60.    After paying off all of the loans, Dr. Hamm had his parents transfer title from their names to the names of the Debtors' children for their respective vehicles. (Trans. at 168:16-21; 63:7-12; 86:18-87:3; Def.'s Exs. G & H). Title was transferred to the Debtors' daughter on March 1, 2002. (Def.'s Ex. H). They then transferred title to the Debtors' son on November 26, 2002. (Def.'s Ex. G).

61.    However, the Debtors chose to preserve title to their own vehicles in the names of Dr. Hamm's parents. (Trans. at 63:13-18; Def.'s Exs. E & F).

62.    Title to the Debtors' vehicles remains in the names of Dr. Hamm's parents to this day. (Trans. at 63:13-18).

### b. Lexus sub-lease

63.    The nominee scheme with the Ford trucks was not the first instance that the Debtors acted to keep title to a vehicle out of their name. The Debtors subleased a Lexus for Mrs. Hamm's use from a personal acquaintance, Beverly Rifkin. (Trans. at 125:15-20).

64.    The sublease arrangement was forged in the beginning of 2000 and continued until January 8, 2001 (the day before Carl and Charlotte Hamm purchased Mrs. Hamm's Ford vehicle). (Trans. at 170:4-6).

65.    The Debtors made the monthly installments on the Lexus for Beverly Rifkin in exchange for Mrs. Hamm's use of the car. (Trans. at 125-126; 170).

66.    At no time was an attempt made to transfer the lease from Beverly Rifkin's name to the Debtors'. (Trans. at 7-9).

### c. *Dealings in cash*

67.    Following their 1999 bankruptcy, and continuing at least throughout 2002, the Debtors habitually – in some cases, more than once a day – withdrew large amounts of cash from an ATM machine.

68.    Over the course of 2001 alone, the Debtors withdrew a total of $81,476 from their personal account. (Def.'s Ex. R, as revised; Trans. at 22-24).

69.    Dr. and Mrs. Hamm represented that this level of ATM activity fairly represented the Debtors' typical practice following their 1999 bankruptcy. (Trans. at 95:12-17; 123:9-11).

70.    Although Mrs. Hamm represented at trial that this sort of ATM activity was the result of their winter holiday planning, this explanation is simply incredible. A review of Government's Exhibits AA, R & S reveals a consistent pattern of large ATM withdrawals with no discernable seasonal correlation.

71.    The Debtors achieved these high annual ATM withdrawals by making regular, large withdrawals of cash. For example, the Debtors' personal checking account statement for February of 1999 opened on February 1st. On that day, the Debtors made three separate $300 withdrawals. (Def.'s Ex. AA; Trans. at 97). They made further $300 withdrawals on February 2nd, February 3rd and February 4th. (Id.) By doing so, the Debtors managed to withdraw a total of $1800 in cash over the first four days of this bank statement cycle. (Id.)

72.    This practice continued at least throughout 2002. For example, the Debtors withdrew $330 and $150 on January 3rd of that year. They then withdrew another $340 on January 4th, $190 on January 7th, $120 and $320 on January 8th, and $340 on January 10th. (Def.'s Ex. S, as revised). Therefore, in the first ten days of 2002, the Debtors withdrew $1,790 in cash.

### d. Nominee business account

73.     The ATM activity discussed above represents the Debtors' withdrawals from their personal account only. Dr. Hamm operated his surgical practice as a corporation and later as an LLC, and those businesses naturally had their own separate and distinct checking accounts. (Trans. at 224:11-25).

74.     Dr. Hamm, in his pre-submitted direct testimony, testified that he also made additional regular ATM withdrawals from his business account. (Plf.'s Ex. 23, Supplemental Direct Testimony at ¶7). Those withdrawals averaged $80 per day ($29,200 per year). (Id. at ¶ 3).

75.     Dr. Hamm also testified that he often used those business account withdrawals for personal expenses, such as gifts for anniversaries, birthdays and "other times of gift giving." (Id. at ¶ 7). The Debtors would also use this money for other personal expenses such as handymen, parking valets and cash wires to their children. (Id. at 6). These business assets also funded trips home for their children. (Id. at 7). None of these categories of expenditures have any readily apparent business purpose.

### e. Lavish spending

76.     The Debtors clearly enjoyed fine dining. The Debtors spent the following amounts dining out, averaging just under $30,000 for each of the last three calendar years:

   a.     $29,165.92 in 2003 (Def.'s Ex. T; Trans. at 88:2-18).

   b.     $24,475.95 in 2004 (Def.'s Ex. U; Trans. at 88:19-89:12).

   c.     $35,459.74 in 2005 (Def.'s Ex. V; Trans. at 89:16-90:6).

77.     The Debtors also provided lavish support for their family, as evidenced by the following:

a.    In 1987, the Debtors purchased a second house and allowed Dr. Hamm's parents to live there rent-free for approximately twelve years (Trans. at 72), as discussed above;

b.    The Debtors made a $10,000 gift to their son to start a business (Trans. at 90:7-11; 120:8-10);

c.    The Debtors paid their son's college tuition, books, room and board for all four years. He attended Boston College, a superb private institution, where the tuition was about $24,000 per year (Trans. at 90:12-23; 120:11-15);

d.    In addition to paying his college tuition, room and board, the Debtors regularly sent their son cash wires averaging about $6,000 per year and made about $10,000 worth of credit card payments on his behalf in one year alone (Def.'s Ex. Z; Trans. at 92:4-93:1). This type of "support" was regularly provided to the Debtors' son (Trans. at 92:24-93:1; 121:1-5);

e.    The Debtors also made regular payments on their daughter's credit cards. In 2001 alone, the Debtors made a total of $10,664.85 worth of credit card payments on behalf of their son and daughter (Gov. Ex. X; 93:4-11);

f.    In 2003, the Debtors subsidized various non-academic expenses for their son totaling $17,897.14 (Def.'s Ex. AB; Trans. at 93:12-21). Included in these expenses were wire transfers, credit card payments, airline tickets and grape tours in California (Def.'s Ex. AB);

g.    In 2001, they purchased their son and daughter new trucks (Def.'s Ex. G & H), as discussed above.

16

## C. Failure to pay

78.    Both Debtors were aware at all times of their obligation to file returns for the relevant years. (Trans. at 102:13-104:1 and 129:18-130:7).

79.    The Debtors did file their tax returns for each of the years at issue.

80.    Both Debtors had a duty to pay their income taxes for the relevant years, and they were both aware of that duty at all relevant times. (Trans. at 102:13-104:1 and 129:18-130:7).

81.    Despite earning nearly $4,000,000 between 1993 and 2004, the Debtors failed to pay fully their federal income tax liabilities for the relevant years (Def.'s Ex. A).

82.    Although the Debtors did make some payments towards their tax debts, they clearly allowed massive sums to go unpaid.  Excluding accrued interest (but including penalties), the Debtors still owe the following amounts for the years at issue:[7]

|   |      |             |
|---|------|-------------|
| a. | 1995 | $ 46,085.01 |
| b. | 1996 | 150,045.52  |
| c. | 1997 | 188,835.66  |
| d. | 1999 | 112,833.41  |
| e. | 2001 | 258,157.04  |
|   | **Total** | **$755,956.64** |

(Def.'s Ex. D).

---

[7]The Government has acknowledged that the penalties and interest thereon are not excepted from discharge pursuant to Section 523(a)(1)(C) or any other possible exception. *See Burns v. United States,* 887 F.2d 1541 (11th Cir. 1989).

83.     Given the Debtors' income and spending habits, the Court finds that they had the capacity to make more payments on their tax debts if they wished, but simply chose not to do so. (Def.'s Ex. A, E, F, G, H, I, K, R, S, T, U, V, W, X, Y, Z, AA, AB, & BD).

## Conclusions of law

1.      The Bankruptcy Code is intended to provide relief to the "honest but unfortunate Debtor." *See Grogan v. Garner,* 498 U.S. 279, 286-87 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934)).  The Debtors in this case plainly fail to fit this description.

2.      Debtors under chapter 7 of the Bankruptcy Code are generally granted a discharge from all debts that arose prior to the filing of the bankruptcy petition. 11 U.S.C. § 727(b).  Consistent with the limitation that this relief is meant for the "honest but unfortunate Debtor,"(*Grogan, supra* at 286-87) "[a] discharge under Section 727 does not discharge an individual Debtor from any debt . . . for a tax . . . with respect to which the Debtor made a fraudulent return *or* willfully attempted in any way to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C) (emphasis added).  The Debtors did not file any fraudulent returns for the years at issue.[8]  Rather, Dr. and Mrs. Hamm's tax liabilities are excepted from discharge under the second prong of § 523(a)(1)(C) because they willfully attempted to evade or defeat their taxes.

3.      The United States bears the burden of proving an exception to discharge by a preponderance of the evidence. *Grogan v. Garner, supra* at 291.  Under § 523(a)(1)(C), Dr. and Mrs. Hamm's 1995, 1996, 1997, 1999 and 2001 federal income tax liabilities are excepted from discharge if they willfully attempted in any way to evade or defeat the payment of these federal tax

---

[8]Except, perhaps, for the improper automobile deductions discussed above.

18

liabilities. *In re Griffith,* 206 F.3d 1389, 1394-96 (11th Cir. 2000); *In re Fretz,* 244 F.3d 1323, 1328-31 (11th Cir. 2001) (*en banc*).

4.      The United States has met its burden of proof, by a preponderance of the evidence, that Dr. and Mrs. Hamm's 1995, 1996, 1997, 1999 and 2001 federal tax liabilities are nondischargeable under § 523(a)(1)(C), because they willfully attempted to evade or defeat these taxes. *See id.*

5.      In order to prove a willful attempt to evade or defeat a tax, the United States need not prove that the Debtors engaged in fraud. *See Fretz,* 244 F.3d at 1330 ("Fraudulent intent is not required"); *In re Peterson,* 317 B.R. 556, 563 (Bankr. N.D. Ga. 2004) ("[t]he Government does not have to establish that the Debtor had fraudulent intentions in order to satisfy the mental state requirement"). Instead the courts generally look to two basic elements: (1) a conduct element, that the Debtor "attempted in any manner to evade or defeat such tax," and (2) a mental state element, that such attempt was done "willfully." *Fretz,* 244 F.3d at 1327.

## I. The conduct requirement

6.      In order to satisfy the conduct element, the Government must establish that the Debtors attempted to defeat their taxes "*in any manner.*" 11 U.S.C. § 523(a)(1)(C) (emphasis added).

7.      Because of this broad language in the statute, the conduct requirement may be satisfied by a showing of either affirmative acts or omissions, that is, acts taken by the Debtors or their failure to take certain acts. *Fretz,* 244 F.3d at 1329.

8.    Furthermore, it does not matter whether these affirmative acts or omissions were taken to evade the assessment of a tax or the collection of a tax. *In re Griffith,* 206 F.3d 1389 (11th Cir. 2000). Establishing either form of conduct amounts to an evasion of tax "in any manner." *Id.*

9.    The conduct requirement is met for a given year where the Government establishes acts or omissions of evasion that took place either during that tax year, or during later years, *see id.,* (noting that by including the phrase "in any manner" in § 523(a)(1)(C), Congress meant for courts to consider "all; not just some, but all" of a Debtor's conduct to evade). *See also Peterson,* 317 B.R. at 564 (courts should consider the "totality of the circumstances" in each case); *In re Meyers,* 196 F.3d 622, 625 (6th Cir. 1999) (subsequent bad conduct may indicate state of mind when failing to file returns); *In re Birkenstock,* 87 F.3d 947, 952 (7th Cir. 1996) (Debtor's conduct during tax years not in issue, including conduct prior to tax years in issue, is relevant in § 523(a)(1)(C) proceeding to determine dischargeability); *Gardner v. United States,* 360 F.3d 551, 560-61 (6th Cir. 2004) (lavish lifestyle in subsequent years evidenced an ability to pay the previous years' tax liabilities and is relevant to determining willful evasion of those previous years' taxes).

10.    Congress did not specify what sort of conduct must be present in order to find that the Debtor "attempted in any way to evade or defeat" his federal tax liabilities. As such, courts must consider the "totality of the circumstances," looking to several different factors as indicia of attempts to evade or defeat tax obligations. *Griffith,* 206 F.3d at 1396-97; *In re Fegeley,* 118 F.3d 979, 983-84 (3rd Cir. 1997); *In re Hassan,* 301 B.R. 614, 620-24 (S.D. Fla. 2003); *In re Spiwak,* 285 B.R. 744, 751 (S.D. Fla. 2002); *In re Peterson,* 317 B.R. at 563-64.

11.    Such indicia of attempts to evade or defeat tax obligations include both acts of commission and acts of omission, and may include conduct such as: (I) understatement of income

20

for more than one year; (ii) implausible or inconsistent behavior; (iii) extensive dealings in cash; (iv)

failure to cooperate with the IRS; (v) inadequate record keeping; (vi) transfer of assets to a family

member; (vii) transfers of assets for inadequate consideration; (viii) transfers that greatly reduce

assets subject to IRS execution; (ix) transfers made in the face of serious financial difficulties; (x)

failure to acquire significant assets relative to a Debtor's earnings; and (xi) any other conduct that

is likely to mislead or conceal. *Fretz,* 244 F.3d at 1327-30; *Spiwak,* 285 B.R. at 751; *Hassan,* 301

B.R. at 620, 622 (quoting *Spiwak,* 285 B.R. at 751); *Peterson,* 317 B.R. at 563-64 (citing *Griffith,*

206 F.3d 1389); *United States v. Sternberg,* 229 B.R. 238, 246 (S.D. Fla. 1998); *Huber v. IRS,* 213

B.R. 182, 184 (Bankr. M.D. Fla. 1997)).

 12. A Debtor's lavish lifestyle is another indicia of attempts to evade or default taxes such

that they are excepted from discharge under § 523(a)(1)(C). *See Gardner v. United States,* 360 F.3d

at 556 (noting the Debtor's "profligate lifestyle"); *Fegeley,* 118 F.3d at 982-984 (upholding the

finding that the Debtor "probably had enough money to pay th[e] taxes[,] . . . spent too much[,] . .

. was much too lavish[, and] . . . didn't make good judg[]ments about the allocations of his

resources"); *Peterson,* 317 B.R. at 562-65 (Debtor exhibited implausible behavior by "maintain[ing]

a lavish and extravagant lifestyle of luxury shopping sprees, fine dining, expensive entertainment

and vacationing while simultaneously failing to fulfill his tax obligations"); *Hassan,* 301 B.R. at 622

(Debtors' lavish lifestyle, accentuated by property purchases, weddings, vacations, fine dining,

daughters' college tuition and other personal expenses).

 13. Against this background, courts in the Eleventh Circuit have denied discharge of tax

liabilities in a variety of factual circumstances. *See, e.g., Fretz,* 244 F.3d 1323 (denial of discharge

to a doctor who, in addition to failing to pay his tax liabilities, had repeatedly failed to file timely tax

returns but had otherwise made no affirmative acts to evade his taxes); *Griffith,* 206 F.3d 1389 (denial of discharge where a Debtor made multiple transfers of assets to family members and sham corporations for little or no consideration in order to shield them from collection by the IRS); *Hassan,* 301 B.R. 614 (denial of discharge to a doctor who, in addition to failing to pay his tax liabilities despite having sufficient assets to do so, had received suspicious loans from his daughter, dealt extensively in cash without sufficient explanation, kept inadequate records of his business dealings, failed to file tax returns, and failed to acquire significant assets despite earning "a great deal of money"); *Peterson,* 317 B.R. 556 (denial of discharge where a Debtor failed to cooperate with the IRS, had made suspicious "loans," and failed to acquire assets).

14.    While the presence of just one act or omission to evade may or may not be sufficient for a finding that the Debtors attempted to evade their tax obligation, "the presence of multiple factors constitutes a rebuttable presumption of willful evasion." *Peterson,* 317 B.R. at 564; *Hassan,* 301 B.R. at 621. The evidence in this case demonstrates that Dr. and Mrs. Hamm have engaged in multiple acts of evasion as early as 1994 and as recently as the trial date in this matter.[9] As a consequence, the Debtors have exhibited sufficient conduct to except from discharge each of the years at issue.

---

[9]As explained above at ¶58 of the Court's findings of fact, Dr. Hamm's pre-submitted direct testimony by affidavit (admitted into evidence on the date of trial) stated that there was no attempt by the Debtors to conceal the true owners of the vehicles. Yet, on cross-examination, Dr. Hamm proceeded to admit that the scheme was orchestrated because he was "facing multiple lawsuits for medical malpractice and there was no advantage for me to have assets." (Trans. at 87:8-10). This effort to mislead the Court through his direct testimony by affidavit demonstrates further conduct to evade his taxes.

### A. Transfer of assets in the face of serious financial difficulty

15.     Dr. and Mrs. Hamm admitted at trial that they knew of their ongoing liabilities with the Internal Revenue Service as early as 1995, the first tax year at issue in this case. For a number of years, they avoided fully paying their tax liabilities without consequence.

16.     In December of 1998 the IRS threatened to issue an involuntary levy on the Debtors' bank account. Faced with this financial threat, the Debtors considered whether to file bankruptcy. Dr. Hamm, a very astute man, purchased a book on the bankruptcy process and learned that if he filed for a chapter 7 (as they ultimately did), many of the Debtors' assets would be liquidated and distributed to their creditors. It is against this factual background that I consider the Debtors' many steps deliberately taken to evade payment of their taxes.

17.     Once deciding to file for a chapter 7, an honest debtor[10] would proceed to file his petition with his assets fully intact so that a fair and equitable distribution of his wealth could be made to his various creditors. This, however, is not how the Debtors chose to proceed.

18.     In order to make the Chapter 7 process more palatable, the Debtors first engaged in a deliberate exercise of "pre-bankruptcy planning," the effects of which left significantly fewer assets available for distribution to their creditors, including the Internal Revenue Service.

19.     The first of these acts occurred within 90 days of the Debtors' May 24, 1999 petition when they dissipated nearly $90,000 from their bank account. Although Mrs. Hamm speculated that this money was used to pay bills, I find her explanation specious and – if by chance it were true –

---

[10]The vast majority of debtors are honest people trapped in financial disaster over which they had, at best, limited control. Divorce; un- or under-insured medical expenses; the loss of a job – these are the hallmarks of most bankruptcy filings. The Hamms' failure to pay their taxes, and their attempts at finding refuge in the bankruptcy court, stem instead from their self-indulgence and an indulgence of their children which they could not honestly afford.

the equivalent of a false oath made by both Hamms in 1999 when they swore to the accuracy of their Statement of Financial Affairs without listing any such payments.

20.     Also within the 90-day period leading to the May 24, 1999 petition, the Debtors sold the town house where Dr. Hamm's parents had resided.  In doing so, the Debtors received more than $66,000 in equity from the property.  That money never made it into the Debtors' bankruptcy estate. Where did it go?  Although Dr. Hamm testified that they used this money to pay off a mortgage arrearage on their primary residence, here again, the record does not support the testimony that the sale proceeds were actually used for the purposes stated.  Because the sale of the town house took place 83 days prior to the May 24th petition, any payment made from the sale proceeds would necessarily have been made within 90 days of the petition date.  Yet, the Debtors' Statement of Financial Affairs failed to list a single payment to any of their creditors made within that time frame. (Def.'s Ex. Q).  The Statement of Financial Affairs also contained nothing regarding the actual sale despite the requirement that the Debtors list all property transfers made within 90 days of the petition.  (Id.; Trans. at 75-76).

21.     This begs the question: why would the Debtors exclude this information from a form that they executed under the penalty of perjury?  There are only two possible answers: first, that the Debtors used these assets for purposes other than fending off a foreclosure and paying bills (which would impeach the Debtors' testimony to the contrary); or, second, that the Debtors simply chose not to disclose such payments, even when prompted for such information under the penalty of perjury.  Either conclusion shows bad faith and attempts to deceive.

22.     Furthermore, even if the Court accepted Dr. Hamm's testimony that the sale proceeds were used to satisfy a mortgage arrearage, it would do nothing to negate the conclusion that the sale

24

amounted to evasion of a tax. If truly facing an imminent foreclosure on their home, the honest debtor would immediately file for bankruptcy with his or her assets fully intact. The automatic stay would then achieve the ultimate goal of preventing the foreclosure without the prior dissipation of assets. In other words, if the Debtors' true motive was to prevent a foreclosure on their primary residence (rather than to sabotage or minimize a distribution to the Internal Revenue Service), all they had to do was to file the bankruptcy petition and trigger the automatic stay. Given that Dr. Hamm had educated himself on the bankruptcy process, he surely knew that.

23.    Instead, the Debtors first sold the property and, they tell us now, used the sale proceeds to satisfy a competing creditor of the Internal Revenue Service, and only then proceeded to file their chapter 7 petition. Additionally, the Debtors inexplicably ridded themselves of another nearly $90,000 in cash before filing their 1999 petition. These pre-bankruptcy maneuvers by the Debtors gave them the unfair benefit of preventing a full distribution of their wealth. Because the simple act of filing for the bankruptcy would have delayed the foreclosure, I conclude that the Debtors were motivated by a desire to frustrate the Internal Revenue Service.

24.    Both Dr. and Mrs. Hamm admit to having read the Statement of Financial Affairs prior to signing it. (Trans. at 76:25-77:2; 113:3-8). Despite Mrs. Hamm's hasty qualifier that she was "not completely sure that she understood all of the financial aspects of it," (Trans. at 6-8) I am convinced after observing her testimony that Mrs. Hamm is a capable and literate woman who can readily understand the concept of whether payments were made to her creditors.

25.    It is clear that the Debtors lied on their 1999 Statement of Financial Affairs in failing to disclose $156,000 of transfers made by them within the 90 days prior to the filing of that case. I can reach no conclusion on the record before me as to whether the Debtors actually used the cash

from their bank account and from the sale of the town house for the purposes claimed in their trial testimony, whether they secreted the money somewhere, or whether it, too, was dissipated in the Hamms' *La Dolce Vita.*[11]  What is clear is that the Hamms undertook a deliberate and calculated effort to prevent the Internal Revenue Service from collecting on their three-quarters-of-a-million-dollar tax obligation.

26.    The proof of claim filed by the Internal Revenue Service in the 1999 chapter 7 included (then nondischargeable[12]) liabilities for the 1995, 1996 and 1997 tax years, each of which is now at issue in this case.  (Def.'s Ex. AC).  Given the Debtors' elaborate efforts to avoid a fair distribution to the Internal Revenue Service in that bankruptcy, I conclude that the Government has established that the Debtors engaged in conduct to evade their taxes "in any manner" for the 1995, 1996 and 1997 tax years.

## B.  Use of nominees: the Ford trucks, the Lexus and the business account

### a.  Ford trucks

27.    Both Debtors and Charlotte Hamm admit that the Ford vehicles were put in the names of Charlotte and Carl Hamm in order to shield them from collection by the Debtors' creditors.

28.    The arrangement clearly involved much planning and collaboration.  It required four separate visits by Carl and Charlotte Hamm to the Ford dealer.  They engaged in all sales negotiations, completed all of the paperwork, took delivery, and placed title in their names.  They then made all installment payments on the auto loans, which the Debtors then reimbursed.

---

[11]"The Sweet Life."  *See La Dolce Vita* (1960), directed by Federico Fellini, starring Marcello Mastroianni and Anita Ekberg.

[12]Income taxes owed for roughly the three years prior to the filing of a bankruptcy petition are by definition nondischargeable under § 523(a)(1)(A), applying § 507(a)(8).

29.     By making the purchases in this manner, the Debtors and their children could enjoy their vehicles without fear of seizure by the Internal Revenue Service.

30.     Then, on February 1, 2002, the Debtors had four checks totaling $57,985.07 issued to Ford Motor Company (disposable assets that clearly could have been paid to the Internal Revenue Service instead) in order to fully pay off the balance on all four truck loans.

31.     If the Debtors' intent in hatching this scheme remained in any doubt, their true motive was made pellucid by their subsequent decision to have title to their children's trucks transferred to Winifred and Aidan while at the same time leaving title to their own vehicles in the names of Charlotte and Carl Hamm.

32.     Although Dr. Hamm implied at trial that their actual goal was to protect their assets from potential medical malpractice claimants (Trans. at 87:8-10), I disbelieve and discount that testimony.  No evidence whatever was introduced to suggest that Dr. Hamm had any medical malpractice exposure which was not adequately insured.  But if the Debtors' true motive was to shield their assets from potential medical malpractice claims against Dr. Hamm, then a transfer of title to Mrs. Hamm would have accomplished that goal.  The fact that title was kept out of the names of both Debtors implies – and almost requires the conclusion – that they were seeking to avoid a creditor to whom they were both liable.  Uniquely, the Internal Revenue Service fits that description; by contrast, neither the potential medical malpractice claimant against Dr. Hamm nor any other creditor identified by the Debtors does.  At the very least it is clear that the Debtors hatched this nominee scheme in order to shield their assets from the reach of creditors.

33.     Because the nominee purchase of the vehicles took place in 2000, that conduct constitutes evasion within the meaning of § 523(a)(1)(C) for all prior relevant tax years, including

1995, 1996, 1997 and 1999.  Additionally, the subsequent acts of paying off all four vehicles, transferring title to the Debtors' children and the decision to maintain title to the Debtors' vehicles in the names of Charlotte and Carl Hamm all took place throughout the course of 2002.  As a consequence, those acts constituted evasion of the final tax year at issue in this matter, 2001.

### b.  Lexus sublease

34.    The Debtors were no strangers to the practice of taking possession of a car in someone else's name. From February of 2000 continuing through January 8, 2001 (the day before the purchase of Mrs. Hamm's Ford), the Debtors took a sublease on a Lexus.  The Lexus was formally leased to a personal acquaintance, Beverly Rifkin.  An arrangement was reached whereby Mrs. Hamm took possession of the Lexus, although it formally remained in the name of Beverly Rifkin.  The Debtors then made the monthly payments on the Lexus.  No efforts were ever made to transfer the lease to the Debtors, and there was no formal written agreement with Beverly Rifkin. This conduct also amounts to evasion.

### c.  Nominee business account

35.    The Debtors withdrew, on average, $80 per day from the business account, an amount slightly less than $30,000 a year.  This practice is relevant here because Dr. Hamm testified that the Debtors used this money for personal purposes such as gift-giving, handymen, parking valets, cash wires, and plane tickets for their children.  None of these were legitimate business expenses.

36.    By using the business account in this fashion, the Debtors effectively established yet another nominee. Rather than take the funds as income from the business and deposit them into their personal account, the Debtors instead chose to skip these steps and to keep these personal assets in an account under the business' name.  To the extent that the Debtors proceeded in this fashion, they

28

managed to protect personal assets in a place safe from levy by the Internal Revenue Service. Given the December 1998 notice of intent to levy and the subsequent actions taken by the Debtors, I conclude that the Debtors used the business account to the extent of their personal-use withdrawals as a kind of personal piggy bank upon which the Internal Revenue Service could not easily levy.

37.     As an additional benefit, because the personal assets kept in the business account were never formally distributed to Dr. Hamm as income, dividend or the like, they were never subject to income taxation, especially in view of the testimony by affidavit that these expenditures were not tracked. (Plf.'s Ex. 23 at ¶6).

38.     As such, using the business account as a nominee amounts to evasion of payment by shielding those assets from levy. It also amounts to evasion of assessment since the money from the business account was never subject to taxation.

39.     This practice by the Debtors constitutes evasion with respect to all prior tax years, including all of those involved in this suit.

### d. Lavish spending: La Dolce Vita[13]

40.     The Debtors enjoyed $4 million of income over the past dozen years. Rather paying their taxes, they chose to use the money they saved by not paying Uncle Sam for various luxuries which, while otherwise unremarkable and inoffensive, become both remarkable and offensive when indulged in by those who flout the basic obligations of citizenship. The Debtors' gross disregard for their tax obligations amounts to continuing conduct on the part of the Debtors to evade payment of their tax liabilities.

---

[13]See note 11, *supra.*

41.     The Debtors spent the following amounts dining out over the last three years: $29,165.92 in 2003; $24,475.95 in 2004; and $35,459.74 in 2005. Their restaurant bills average nearly $30,000 a year; they dined weekly at some of the finest restaurants in Fort Lauderdale. The Debtors testified at trial that they spent these amounts because Mrs. Hamm's rheumatoid arthritis prevented her from cooking. (Trans. at 169:9-12; Plf.'s Ex. 24). Mrs. Hamm's medical condition is of course to be regretted, and may explain in part why she has not held a job since 1971. But the Debtors' children left home for college years ago, and the record fails to show why Mrs. Hamm's medical condition could possibly require restaurant bills for two people regularly ranging from $150 to $200. In addition to fine dining, Fort Lauderdale offers a whole host of inexpensive and moderately-priced restaurants and take-out establishments. Most people eat at home. Apparently so do the Hamms: in addition to their restaurant bills, Mrs. Hamm testified that the Debtors' grocery bills average $500 a week. How it is possible to dine out as often and as well as the Hamms routinely did and still have weekly grocery bills of $500 for two people is a mystery which the Debtors never attempted to explain.

42.     There are many additional examples of the Debtors' lavish spending;

a.      In 1987, the Debtors purchased a second piece of real estate and paid the mortgage, insurance and other expenses. They purchased this property in order to provide living space for Carl and Charlotte Hamm, who never reimbursed the Debtors for any of these expenses. The Debtors paid the mortgage and related expenses for Carl and Charlotte Hamm for more than eleven years.

b.      The Debtors made a $10,000 gift to their son in 1995 so that he could start a business.

30

c.      The Debtors paid their son's college tuition, books, room and board for four years. He attended Boston College, a wonderful institution with which I have more than passing familiarity, where tuition was about $24,000 per year.

d.      Even after paying Aidan's tuition, room and board, the Debtors regularly sent their son money wires totaling approximately $6,000 per year. They also averaged about $10,000 per year in credit card payments made on their son's behalf.

e.      In 2003 alone, the Debtors spent a total of $17,897.14 supporting their son. Included in this total are airline tickets and a vineyard tour in California.

f.      The Debtors also regularly paid their daughter's expenses, such as car maintenance and credit card payments.

g.      The Debtors purchased new trucks for their son and daughter in 2001.

h.      On February 1, 2002, the Debtors paid off all four auto loans, which totaled $57,985.07.

43.      After first satisfying their tax liabilities, most people find themselves unable to afford these types of discretionary expenses. It is of course obvious that many more people could pay for their children's private college tuition, car loans, business expenses and credit card payments (as well as their parents' mortgage) if they, too, disregarded their duty to pay income taxes. Honest taxpayers, the overwhelming majority of Americans, should not be forced to subsidize the excessive spending habits of these Debtors.

44.     I am appalled that a Harvard educated[14] and trained surgeon like Dr. Hamm would be unable to recognize the gross impropriety of his lifestyle choices.  What I find most remarkable about Mrs. Hamm's testimony is her unembarrassed claim that their lifestyle is "fairly modest." (Trans. at 126:18-22).  It is not.  Wholly admirable in the abstract – it would be the envy of the overwhelming majority of Americans – the Debtors' lifestyle is self-indulgent and fundamentally dishonest in the face of the $755,000 which the Hamms owe in back taxes and penalties.  The Debtors' extraordinary spending habits, spanning the course of 1987 through 2005, all amount to further conduct by the Debtors to avoid paying their taxes.

### e. ATM withdrawals

45.     The Debtors dealt significantly in cash.  As described above, the Debtors withdrew a total of $81,476 in cash from their personal account in 2001 alone, and they testified that this level of activity was fairly representative of other years as well.  These large, regular ATM withdrawals (oftentimes, there were multiple withdrawals on a given day for hundreds of dollars each) amount to conduct to evade payment of the Debtors' taxes.

### f. Automobile deductions

46.     The details of these deductions are discussed above.  The Debtors were not entitled to the deductions and, by taking them anyway, they successfully evaded the assessment of income tax on more than $98,000 during the period spanning 1994 though 1999.

47.     These wrongful deductions amount to further conduct for each of the tax years at issue in which these deductions were taken; to wit, 1995, 1996, 1997 and 1999.

---

[14]Dr. Hamm and I overlapped by a year as undergraduates at Harvard College.  We did not know one another.

### g. *Failure to pay*

48.    Although alone insufficient to make a finding of willful evasion, it is relevant to the conduct requirement that the Debtors knew of their debts, yet failed to satisfy them.[15]

### h. *Failure to acquire assets*

49.    Despite the Debtors' significant income, their only asset is a single piece of real estate, their homestead, with (they claim) zero equity. (Trans. at 104:14-15). Otherwise, the Debtors claim to own no real estate nor do they own any cars, boats, retirement accounts, stocks, mutual funds or the like.  (Trans. at 104:6-105:5).  After $4 million of income over the past dozen years, it is simply remarkable that the Debtors own no assets.

## C.  The mental state requirement

For a debtor's tax liabilities to be excepted from discharge under Section 523(a)(1)(C), the debtor's attempts to evade or defeat such tax liabilities must be "willful," meaning that debtor's actions were done "voluntarily, consciously or knowingly, and intentionally." *Fretz,* 244 F.3d at 1330.

50.    In order to meet the mental state requirement, the United States must establish by a preponderance of the evidence that: (1) the Debtors had a duty to file income tax returns and pay

---

[15]Even if the Debtors did not have the ability to fully pay their 1995, 1996, 1997, 1999 and 2001 tax liabilities in subsequent years, their debts cannot be discharged.  Dischargeability under 11 U.S.C §§ 727 and 523(a)(1)(C) is dependent solely on whether the Debtors willfully took actions which constitute attempts to evade or defeat the payment of their tax obligations.  Ability to pay in full is not a requirement. *See Birkenstock,* 87 F.3d at 953; *Landi,* 289 B.R. at 180-82; *Mathis v. United States,* 310 B.R. 468, 470-72 (Bankr. S.D. Fla. 2004); *United States v. Doyle,* 276 F. Supp. 2d 415, 424 (W.D. Pa. 2003).  "[E]ven where a taxpayer does not have the financial means to pay all of the taxes owed, the taxpayer can still 'willfully attempt [ ] in any manner to evade or defeat such tax.'" *Id.*

taxes for the years in question; (2) that they knew they had such a duty; and (3) that they voluntarily and intentionally violated that duty. *Id.*

51.     It is undisputed that Dr. and Mrs. Hamm were at all times aware of their obligation to file income tax returns and to pay their taxes. The only question remaining as to the mental requirement is whether Dr. and Mrs. Hamm voluntarily and intentionally violated that duty.

52.     To determine whether a debtor voluntarily and intentionally violated a known duty to pay his income taxes, courts again look to the indicia discussed in detail, above, this time focusing on whether the debtor voluntarily and intentionally committed those acts. *See Griffith,* 206 F.3d at 1396-97; *Spiwak,* 285 B.R. at 751; *Peterson,* 317 B.R. at 563-64; *Hassan,* 301 B.R. at 620-21. *Fegeley,* 118 F.3d at 984; *Birkenstock,* 87 F.3d at 952; *Landi,* 289 B.R. at 181. *See also Fretz,* 244 F.3d at 1331.

53.     A finding of "willfulness" requires only a showing that the debtor took such actions willingly, not that he took such actions with an intent to defraud the United States. *See Fretz,* 244 F.3d at 1330 ("Fraudulent intent is not required"); *In re Peterson,* 317 B.R. 556, 563 (Bankr. N.D. Ga. 2004) ("[t]he Government does not have to establish that the debtor had fraudulent intentions in order to satisfy the mental state requirement"). *See also Griffith,* 206 F.3d at 1396-97; *Fegeley,* 118 F.3d at 984; *Birkenstock,* 87 F.3d at 952; *Spiwak,* 285 B.R. at 750; *Hassan,* 301 B.R. at 618; *Landi,* 289 B.R. at 181. As further explained by the Eleventh Circuit in *Fretz:*

> the mental requirement "prevents the application of the [discharge] exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate."

244 F.3d at 1330, *quoting Birkenstock,* 87 F.3d at 952.

54.    If the totality of the circumstances tends to show that a debtor acted voluntarily and intentionally in his attempts to evade or defeat the payment of his taxes, the third prong of the mental of the mental element of "willfulness" is satisfied. *See Griffith,* 206 F.3d at 1396-97; *Fegeley,* 118 F.3d at 983-84; *Spiwak,* 285 B.R. at 751; *Peterson,* 317 B.R. at 562-67; *Hassan,* 301 B.R. at 621; *Landi,* 289 B.R. at 182.

### a. Town house, bank account, and pre-bankruptcy "planning"

55.    As described more fully above, shortly after receiving a notice of intent to levy by the Internal Revenue Service, the Debtors filed their first joint bankruptcy petition. Within the 90-day period preceding their petition date, the Debtors sold the town house occupied by Dr. Hamm's parents and dissipated nearly $90,000 from their bank account. These acts significantly depleted the amount of assets available for distribution in their chapter 7 bankruptcy. Given their financial state at the time, their failure to disclose these transactions in their Statement of Financial Affairs appears be nothing more or less than fraud.[16]

56.    These acts were performed willfully. By the time these events took place, the Debtors had already began planning for bankruptcy. The Debtors understood the practical implications that their maneuvers would have on that bankruptcy because Dr. Hamm had educated himself about the liquidation process. As a consequence, these events cannot be dismissed as "inadvertent mistakes." Instead, based on the totality of the circumstances, it is clear that they were the result of careful calculation and planning based upon at least a basic understanding of the bankruptcy process.

57.    The financial ignorance that Mrs. Hamm sought to display during her testimony does nothing to negate her willfulness. Her suggestions that she was unfamiliar with such common

---

[16]No such showing of fraud is required for purposes of this litigation.

financial concepts as bank statements and checking account debit cards was wholly unbelievable. Nor was it credible to hear Mrs. Hamm cite her failure to take college-level math as a reason for her failure to understand the financial transactions at play in this case. (Trans. at 195:9-15). The financial concepts involved in this case do not require familiarity with even sophisticated arithmetic. Furthermore, even if it were true that Mrs. Hamm was indeed financially uninvolved, it is still the case that she willfully participated in the Debtors' voluntary omission of these transactions from the 1999 Statement of Financial Affairs. Her complicity in this regard is sufficient for me to find that she willfully engaged in these acts, and I do so find.

### b. Use of nominees: the Ford trucks, the Lexus, and the business account

58.     Following their 1999 bankruptcy, the Debtors purchased four new trucks and placed title in the names of Dr. Hamm's parents. As a consequence, Charlotte and Carl Hamm held the vehicles merely as the nominees of the Debtors. Charlotte Hamm and both Debtors testified at trial that this arrangement was conceived in order to shield the cars from potential creditors. This motive is further verified by the decision to transfer title to the names of the Aidan and Winifred after their trucks had been paid off, and the concomitant decision to preserve title of the Debtors' trucks with the nominees. This arrangement assured that the Internal Revenue Service could not collect the Debtors' delinquent taxes by seizing their vehicles. As with the pre-bankruptcy maneuvers, this was a well-conceived, deliberate scheme that easily meets the mental state requirement. Even the Debtors admit that the arrangement was intended to shield the vehicles from seizure.

59.     The same is true with regards to the Lexus sublease and the Debtors' use of the business account as their nominees. Both of these acts were not the result of "inadvertent mistakes." Rather, they were performed knowingly, voluntarily and intentionally.

36

### c. Automobile deductions and understatement of income

60.     As stated above, accountant Bennett had testified that it was his practice to advise his clients of the tax laws so that expenses could be properly categorized. As a consequence, I conclude that both that Dr. and Mrs. Hamm were aware of the two qualifying criteria for auto expense deductions – ownership and business use – and that they realized that they failed to meet those criteria. These fraudulent deductions reduced the amount of income subject to taxation and amounted to an evasion of assessment. Because the Debtors knew they did not meet the qualifying criteria, they knowingly, voluntarily and intentionally failed to report over $98,000 in income over the course of the relevant years.

### d. Lavish spending and failure to pay

61.     I have extensively detailed the Debtors' extravagant spending habits. As noted above, both Debtors admit to having knowledge of their tax liabilities since at least 1995. In the face of that knowledge, they continued to spend money on various luxuries rather than on their mounting federal income tax liabilities. This spending demonstrated a decision made by the Debtors to favor self-indulgence over their tax debts. That decision was voluntarily and knowingly made by the Debtors.

### e. ATM withdrawals and dealings in cash

62.     The Debtors withdrew more than $80,000 in 2001 alone, and testified that this was their typical practice. Courts have held that significant dealings in cash can amount to conduct to evade a tax. *See, e.g., Hassan,* 301 B.R. at 620-621. There is no doubt that the Debtors acted knowingly, voluntarily and intentionally when making their regular visits to the ATM machine.

**Conclusion**

The United States has met its burden of proving by a preponderance of the evidence that Dr. Jeffrey C. Hamm and Honie Sue Hamm's federal income tax liabilities for the 1995, 1996, 1997, 1999 and 2001 tax years are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C). Judgment will be entered for the United States.

###

Copies to:

Kevin Gleason
Kevin Gleason, P.A.
4121 North 31st Avenue
Hollywood, FL. 33021

Richard D. Euliss
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044

I:\ORDERS\05-2370 Hamm.IRS.FFCL.wpd